**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

JUAN ULLOA,                              )
                                         )
          Plaintiff,                     )
                                         )
     vs.                                 )          Case No. 3:21-cv-00495-RCJ-CSD
                                         )
NEVADA GOLD MINES, a Delaware            )                    **ORDER**
Limited Liability Company,               )
                                         )
          Defendant.                     )
_____)

Pending before the Court are Defendant's Motion for Summary Judgment, (Dkt. 97), and Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment and All Exhibits Thereto, (Dkt. 101). After careful review, the Court denies as moot Plaintiff's Motion to Strike, (Dkt. 101). The Court grants in part and denies in part Defendant's Motion for Summary Judgment, (Dkt. 97). Defendant is entitled to summary judgment in its favor on Claims 1, 2, 4, and 5 of Plaintiff's Second Amended Complaint, (Dkt. 48 at 11–14, 15–18), which are dismissed with prejudice. Arising only under state law, the Court declines to extend supplemental jurisdiction over Claim 3, (*id.* at 14–15), which is dismissed without prejudice.

## I.    Background

Plaintiff Juan Ulloa was hired by Defendant, Nevada Gold Mines LLC[1] ("Barrick"), as an equipment operator in 2006. (Dkt. 102-1 at 37). After thirteen years of employment, Ulloa was

_____

[1]      Defendant is the real party in interest for Ulloa's employer, Barrick Goldstrike Mines Inc. (Dkt. 48 at 2); (Dkt. 97 at 1 n.1).

terminated by Barrick on October 16, 2019, due to "a demonstrated patter of undesirable behaviors." (*Id.* at 286).  On June 4, a few months prior to Ulloa's termination, he was in a work-related incident that resulted in harm to his back.  (*Id.* at 145, 149, 151).  After waiting two days to report the incident, (*id.* at 96–97), Ulloa filled out a Form C-4[2], (*id.* at 153), and requested worker's compensation for the duration of his recovery.  (*Id.* at 258).  At this time, Barrick placed Ulloa on paid leave.  (*Id.* at 224, 226).  On October 2, Ulloa's doctor formally "released" him for "full-time full duty work" finding that he had "suffered no permanent disability," (*id.* at 276), and Ulloa requested to start working again.  (*Id.* at 270).  But Ulloa's request was denied, (*id.* at 124–25), and he remained on paid leave until his termination on October 16.  (*Id.* at 273).

Ulloa is now suing Barrick.  He claims that Barrick's actions—specifically his termination and the company's alleged failure to accommodate him—violated both the Americans with Disabilities Act ("ADA") and Chapter 613 of the Nevada Revised Statutes.  He also argues that Barrick's actions are actionable under state law as violations of Nevada public policy.  (Dkt. 48 at 11–18).  Barrick seeks summary judgment in its favor on all five claims, arguing that "Ulloa has failed to carry his burden to demonstrate a prima facie case of either failure to accommodate his alleged disability or disparate treatment," and that he "will be unable to demonstrate to this Court that his tortious discharge claim does not rely upon an impermissible mixed-motives theory." (Dkt. 97 at 2).  In response, Ulloa alleges that Barrick has "not presented the whole story," and he

---

[2]      Form C-4, also known as a Claim for Compensation, is what an employee must fill out "within 90 days after an accident" in order to receive worker's compensation in Nevada.  (Dkt. 103-19 at 2).  After the form is filed, "[t]he treating physician or chiropractor must, within 3 working days after treatment, complete and mail to the employer, the employer's insurer and third-party administrator, the Claim for Compensation."  (*Id.*).

attempts to overcome summary judgment by raising apparent disputes (without sufficient support in the record).[3]  (Dkt. 103 at 1, 2–17).  In reply, Barrick argues that Ulloa's "plethora of allegations" are unsupported by the record and do not, themselves, create a genuine dispute of material fact.  (Dkt. 110 at 2).  The Court finds that the following facts are not in dispute.

### A.    Barrick's Policies

Under Barrick's Standard of Conduct Policy, the "[f]ailure to report an on-the-job or job related environmental, safety or health injury or incident" triggers accelerated discipline rules. (Dkt. 102-1 at 50); (*see also id.* at 147) (explaining that "failing to report an incident" is considered by the company to be an "unacceptable behavior").  Under the accelerated discipline rules, employees who already have an "active written reminder" due to previous infractions face "termination" if they commit an 'accelerated' offense under the Standard of Conduct Policy.  (*Id.* at 39–40).  Upon his employment, Ulloa received a copy of the Standard of Conduct Policy and "agree[d] to review and act in accordance" with those rules.  (*Id.* at 47).  In his training, Ulloa was taught how to handle an incident and testifies that he was trained and told multiple times that employees are required to "report [incidents] immediately[.]"  (*Id.* at 76–77, 78, 84).  Ulloa knew to report incidents "immediately" whether they were as minor as swipes or as serious as resulting in pain.  (*Id.* at 108–09).  Knowing this, when Ulloa was involved in an incident in 2009 in which two trucks made contact, resulting in minor damage, he promptly reported it.[4]  (Dkt. 102-1 at 45).

---

[3]     Notably, Ulloa often seeks to establish factual disputes by asserting that there is disagreement as to legal conclusions, for example the existence of a legal duty.  (*See* Dkt. 103 at 17) ("[I]t is disputed that Defendant had no *duty* to accommodate Juan …" (emphases added)).

[4]     Plaintiff argues that this incident from ten years ago is "irrelevant" to the issues in this case.  (Dkt. 103 at 2).  But the Court agrees with Defendant that the incident is relevant only in that it is evidence that Ulloa "knew" that even minor incidents "needed to be reported" without undue delay.  (Dkt. 110 at 4).

**B.     Ulloa's Disciplinary History**

Since starting his employment with Barrick in 2006, Ulloa had only been disciplined a handful of times.[5]  (*See* Dkt. 102-1 at 283).  Relevant for the purposes of this case, on May 2, 2019, Ulloa was disciplined for "[l]oitering or wasting time" and "violation of the fatigue management policy," which the company considered a safety concern.  (*Id.* at 63).  The written reminder given to Ulloa stated that "[f]uture incidents/accidents resulting from violation of Standards of Conduct Policy, Standard Operating Procedures and/or safe working practices may result in further disciplinary action, up to and including termination of employment."  (*Id.* at 64).

At the time of this discipline, Barrick held a meeting with Ulloa to discuss their safety concerns, which Ulloa discreetly recorded.  (*See id.* at 66–67).[6]  An email sent by Ulloa's supervisor following that meeting attests that Ulloa "acknowledged that he did over sleep on his break" in violation of the company's policy.  (*Id.* at 139).  The next day, management held another meeting with Ulloa, that he similarly recorded, (*see id.* at 140), in which he was shown video recordings of the alleged safety violations captured on his truck's monitoring system.  (*Id.* at 142).  The videos showed Ulloa struggling to stay awake while on the job, which the company explained to be a serious safety violation.  (*See id.* at 140).

---

[5]     The Court will not discuss the discipline on April 30, 2019 for attendance violations, (Dkt. 102-1 at 58), as those absences were retroactively approved when Ulloa was later granted leave under the Family and Medical Leave Act ("FMLA").  (*Id.* at 228).  The Performance Action Plan ("PAP") that resulted from the April 30 discipline was neither used in the accelerated discipline progress nor included on the Disciplinary Report prepared for the purposes of that process.  (*Id.* at 283); (*see also* Dkt. 103-23 at 15).

[6]     All recordings that have been offered as exhibits in this case were filed manually.

### C.    The Incident and Ulloa's Injury

On June 4, 2019, Ulloa was involved in an incident where his truck, while being loaded, was struck by a shovel bucket while he was in the haul of the truck.  (Dkt. 102-1 at 144).  The collision caused the truck to violently bounce, thrusting him into the air.  (*Id.* at 101, 109–10). Although his pain at the time of the incident was only "a little needle poke in [his] lower back," Ulloa remembers being jerked down and feeling a series of pops, (*id.* at 101–05), while the shovel operator yelled, "damn I did feel that one," over the radio.  (*Id.* at 144).  That night, Ulloa felt another little "flash" of pain and took some mild pain reliever before bed.  (*Id.* at 106–07).  At his deposition, Ulloa characterized the bouncing as the worst he had ever seen in his thirteen years of driving, (*id.* at 104), saying that the incident was so "serious" that he could have broken his neck had he not been wearing a seatbelt.  (*Id.* at 109).

Despite the seriousness of the incident, Ulloa failed to report what had happened until two days later.  (*Id.* at 96).  At his deposition he testifies that he could have called his supervisor to report the incident on June 5, but he chose not to because his pain was "like a little flash" and not "staying."  (*Id.* at 107).  Despite having been trained that "anything out of the ordinary" could constitute an incident which required immediate reporting under the company's policy, (*id.* at 85), Ulloa delayed submitting an incident report until he began to feel a "sore back[.]"  (*Id.* at 151). Ulloa then provided a written statement on what had happened two days earlier, (*id.* at 145), and the company began gathering statements for an investigation.  (*Id.* at 161, 196).  After Ulloa filed his Form C-4, (*id.* at 153), the company's worker's compensation representative filled out the corresponding Form C-3, noting that there were questions about the validity of the claim because it was a "late report per Barrick policy[.]"  (*Id.* at 222).  From then on, Ulloa was placed on paid

leave, and Barrick suspended its investigation until Ulloa was medically released to return to work. (*See id.* at 224).

During his paid leave, Ulloa first saw Dr. Black who assessed him for lumbar strain and groin contusion. (*Id.* at 234). Dr. Black later took some x-rays, (*id.* at 237), but found nothing out of the ordinary, (*id.* at 239), so he released Ulloa to "perform his regular job duties with attention not to aggravate" on June 13. (*Id.* at 240). Still, Ulloa was experiencing continued pain, so he saw Dr. Reyher on June 26 who placed significant restrictions on Ulloa, prohibiting him from pushing, pulling, or carrying anything over ten pounds. (*Id.* at 246). Barrick was unable to accommodate these restrictions, (*id.* at 251), and accepted Ulloa's worker's compensation claim for his "left side low back strain and left side" contusion. (*Id.* at 260). The company refused to approve treatment for any other body part because Dr. Reyher believed the additional complained-of pain was "no more than a muscle strain" and, moreover, because Ulloa had been "non-compliant with [his] physical therapy[.]" (*Id.*). After a few more follow up appointments, Dr. Reyher found on September 18 that, despite a forty-pound weight limit, Ulloa "should be able to do his full-time full duty work." (*Id.* at 267). Then, on October 2, Dr. Reyher removed the forty-pound restriction and released Ulloa to "full-time full duty work" concluding that he "ha[d] suffered no permanent disability." (*Id.* at 276).

Eager to return to work, Ulloa sent a letter to Barrick asking for permission to return.[7] (*Id.* at 270). But Ulloa's request was denied, and he remained on paid leave pending the conclusion of

---

[7]    Ulloa's October 2 letter requesting to return maintains that he has "disabilities" for which his "doctor has order[ed] medical restrictions[.]" (Dkt. 102-1 at 270). Therefore, he asks for reasonable accommodations, but the understanding in his letter was inconsistent with the release provided by Dr. Reyher. (*Id.* at 276). Regardless, his continued suspension was not a result of his requested

the investigation into his failure to report the incident.  (*Id.* at 124–25); (*see also id.* at 273) (correspondence evidencing that Ulloa's suspension was "not for lack of accommodation" and was instead "pending an investigation").  Ulloa met with Barrick on October 4, a meeting that he also secretly recorded, (*id.* at 281), during which he confirmed his understanding that company policy requires employees to report incidents immediately.  (*Id.* at 280).  Afterwards, the company prepared a Discipline Report, which found that:

> Based on the written statements, the radio correspondence between the two operators, Juan Ulloa acknowledging the collision was out of the norm and that Juan understand[s] the reporting requirements, this was a failure to report and incident/injury.

(*Id.* at 283–84).  Finding that "[Ulloa] confirmed his understanding of the reporting policy," the Discipline Report recommended that he be terminated.  (*Id.* at 284).  Accordingly, on October 16, Ulloa was terminated pursuant to the Discipline Report as "a result of a demonstrated pattern of undesirable behaviors."  (*Id.* at 286).

## II.    Legal Standards

### A.    Motion for Summary Judgment

Rule 56 provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought," and "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Accordingly, summary judgment must be entered against a party only when it "fails to

---

accommodations but instead due to the pending investigation into his failure to report the June 4 incident.  (*Id.* at 273).

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Material facts are those which may affect the outcome of the case, and those "that are irrelevant or unnecessary will not be counted." *Id.* at 248. And a dispute as to a material fact is genuine if there is sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In ruling on a motion for summary judgment, courts use a burden-shifting scheme. *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1259 n.2 (9th Cir. 2016). "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *Id.* (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)); *see Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017) ("On summary judgment, the moving party bears the burden of establishing the basis for its motion and identifying evidence that demonstrates the absence of a genuine issue of material fact."). If the moving party meets that burden, the burden shifts to the non-moving party, who "must go outside of the pleadings to point to facts that establish a genuine issue for trial." *Mays v. United Ass'n Loc. 290 Apprenticeship & Journeymen Training Tr. Fund*, 407 F. Supp. 3d 1121, 1142 (D. Or. 2019). "[I]f the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire & Marine Ins. Co., Ltd. V. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000). But "[i]f the moving party fails to meet its initial burden, summary judgment must be denied, and the court

need not consider the nonmoving party's evidence." *Wormuth v. Lammersville Union Sch. Dist.*, 305 F. Supp. 3d 1108, 1117 (E.D. Cal. 2018); *see also Nissan*, 210 F.3d at 1102–03 ("If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial.").

When the moving party would bear the burden of proof at trial, it can meet its initial burden by "com[ing] forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (cleaned up). But, on the other hand, "[w]here the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Coomes*, 816 F.3d at 1259 n.2 (quoting *In re Oracle*, 627 F.3d at 387). "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* A heavy burden to satisfy, "[t]he non-moving party must show more than the mere existence of a scintilla of evidence," and instead "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*; *see also Bennett v. San Bernardino Valley Cnty. Coll.*, 2018 WL 11347909, at *4 (C.D. Cal. Nov. 29, 2018). The nonmoving party cannot avoid summary judgment by relying solely on "conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). And "the arguments and statements of counsel 'are not evidence and do not create issues of material fact capable of defeating an otherwise valid motion for summary judgment.'" *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) (quoting *Smith v. Mack Trucks*, 505 F.2d 1248, 1249 (9th Cir. 1974)).

A district court "may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Importantly, it is not the "task" of the district court "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Instead, courts "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.* (citation omitted). Finally, it is generally the case that the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see also Davis*, 854 F.3d at 598. But this is not so when there is no "'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* Ultimately, "the availability of summary judgment turn[s] on whether a proper jury question [is] present." *Anderson*, 477 U.S. at 249.

**B.     Motion to Strike**

The Federal Rules of Civil Procedure allow courts "to strike portions of [a] complaint," *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000), containing defenses that are "insufficient" or "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  A matter is immaterial when it has "no essential or important relationship to the claim for relief or the defenses being pleaded." *Czuchaj v. Conair Corp.*, 2014 WL 1666427, at *2 (S.D. Cal. Apr. 17, 2014).  It is impertinent when it "includes statements that do not pertain, and are not necessary, to the issues in question." *Id.*  And it is scandalous when it "includes allegations that cast a cruelly derogatory light on a party or other person." *Id.*

Ultimately, "the function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial[.]" *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983).  Considering both this function and "the express language of the rule," it is established that "only *pleadings* are subject to motions to strike," not other documents, such as motions. *Id.* (emphasis added) (holding that the district court erred when it struck a motion to reconsider under Rule 12).  Courts generally disfavor motions to strike, which "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." *Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991).  Whether to strike material from the pleadings is left to the discretion of the district court. *Nurse*, 226 F.3d at 1000.

Unlike under Rule 12(f), per this Court's Local Rules, "[t]he court may strike documents," including non-pleading documents such as motions, "that do not comply with [the] rules" for electronic case filing.  LR IC 7-1 (Noncompliant Documents); *see also* LR Part IC (Electronic

Case Filing).  Application of a court's local rules is discretionary.  *Ghazali v. Moran*, 46 F.3d 52, 53 (9th Cir. 1995) ("Only in rare cases will we question the exercise of discretion in connection with the application of local rules." (citation omitted)).

**III.  Discussion**

**A.   Plaintiff's request to strike Defendant's motion and its exhibits is moot.**

Ulloa asks the Court to "order the Motion for Summary Judgment and its exhibits … be stricken." (Dkt. 101 at 3).  He argues that a number of exhibits attached to the motion contain unredacted, identifying information in violation of LR IC 6-1 (Redaction) and should be stricken under LR IC 7-1 (Noncompliant Documents).  In response, Defendant argues that Ulloa's motion is procedurally improper under the Federal Rules because only pleadings are subject to Rule 12(f) motions to strike. (Dkt. 106 at 2–3).  In addition, Defendant argues that Ulloa's motion is meritless because "[t]he same day [Ulloa] filed his Motion, Defendant filed a notice of corrected image that contained redactions to those portions of the exhibits that were inadvertently filed." (*Id.* at 3).  In reply, Ulloa argues that Defendant's error should not be overlooked because "this is not the first time" this has happened in this case, so, under the Local Rules, "[t]he motion with all of the exhibits should be stricken." (Dkt. 107 at 2).  The Court agrees with Defendant.

Defendant is correct that this motion is an improper attempt to strike non-pleadings under Rule 12(f).  Still, the Local Rules empower the Court to *sua sponte* strike any document that does not comply with the redaction requirements.  In this case, though, the Court sees no need to strike any documents because corrected versions have been filed, resolving the problem.  Accordingly, Ulloa's Motion to Strike, (Dkt. 101), is denied as moot.

Even so, the Court will issue minor sanctions of $100 on Barrick for recklessly risking Ulloa's privacy for the second time in this case.  Sanctions issued for failure to follow a court's local rules "must be proportionate to the offense and commensurate with principles of restraint and dignity inherent in judicial power[.]"  *United States v. Haro*, 2022 WL 17663518, at *1 (9th Cir. Dec. 14, 2022) (quoting *Zambrano v. City of Tustin*, 885 F.2d 1473, 1480 (9th Cir. 1989)).  "Consequently, absent grossly negligent, reckless, or willful conduct, monetary penalties such as jury costs or judicial sanctions cannot be fairly levied against counsel for a violation of the local rules."  *Zambrano*, 885 F.2d at 1480.  Here, Defendant claims that "[t]he monetary consequences if this Court were to strike the motion or its exhibits would be thousands of dollars in legal fees," which it argues "is far too severe a sanction under these circumstances."  (Dkt. 106 at 4).  The Court agrees, so the Court will instead only issue a penalty of $100.  *See Pro. Programs Grp. v. Dep't of Com.*, 29 F.3d 1349, 1353 (9th Cir. 1994) ("[T]he district court has broad discretion to depart from the strict terms of the local rules where it makes sense to do so and substantial rights are not at stake.").

**B.    Defendant is entitled to summary judgment in its favor on Plaintiff's disability discrimination claims.[8]**

To maintain a claim for disability discrimination under the ADA, the plaintiff must make a prima facie showing that "(1) he is disabled within the meaning of the ADA; (2) he is qualified (i.e., able to perform the essential functions of the job with or without reasonable accommodation);

---

[8]    Ulloa brings both his ADA claims—for discrimination and failure to accommodate—pursuant to Nevada law, as well, under NRS 613.330.  (Dkt. 48 at 11–14, 15–18).  As this Court has previously noted, (Dkt. 92 at 12–13), these claims are evaluated using the same standard.  *See Pope v. Motel 6*, 121 Nev. 307, 311 (2005); *Shufelt v. Just Breaks Corp.*, 2017 WL 379429, at *3 (D. Nev. Jan. 25, 2017).  Thus, the Court need not discuss or resolve separately the state law claim from its corresponding claim under the ADA.

and (3) the employer terminated him because of his disability." *Nunies v. HIE Holdings, Inc.*, 908 F.3d 428, 433 (9th Cir. 2018); *see also Bates v. UPS, Inc.*, 511 F.3d 974, 988 (9th Cir. 2007) (explaining that, under the ADA, "an employee bears the ultimate burden of proving" these three elements).  Relevant for purposes of this case, the plaintiff must show that each of these elements "existed at the time of the discrimination[.]"  *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1112 (9th Cir. 2000)  ("[O]ne must be able to perform the essential functions of employment *at the time that one is discriminated against* in order to bring suit under [the ADA]. In addition, one must be discriminated against 'because of the disability'—which requires that the disability exist *at the time of the discrimination* and be the motivation for the discrimination." (emphases added)).

If the plaintiff meets this burden, the burden shifts to the defendant to articulate "a legitimate, nondiscriminatory reason for its employment action." *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50 (2003).  Once a legitimate, non-discriminatory reason has been provided, the burden returns to the plaintiff to demonstrate that the defendant's "stated reason for [plaintiff's] rejection was in fact pretextual." *Id.* at 52 (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)).  The Court finds that Ulloa has failed to make this prima facie showing and that he further failed to raise any genuine issue of material fact that would allow him to make such a showing.[9]

---

[9]    Even if Ulloa could make the required prima facie showing, Barrick has provided a legitimate, non-discriminatory reason for his termination (violation of the company's Standard of Conduct Policy).  (Dkt. 97 at 23–25).  Ulloa has not carried his burden of demonstrating that this reason was at all pretextual.  While Ulloa does allege that Barrick's given reason was pretextual, (Dkt. 103 at 26, 27, 20–21, 22), his claims are entirely speculative.  He offers no evidence in the record, and the Court has found no found evidence in the record, to support his claims.

**1.    At the time he was terminated, Ulloa was not disabled under the ADA.**

The ADA defines disability with respect to an individual as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id.* (quoting 42 U.S.C. § 12102(1)(A)–(C)). While the ADA, itself, does not define what an impairment is or what 'substantially limits' means, federal regulations provide some guidance. Title 29 of the Code of Federal Regulations defines physical impairment as "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine[.]" 29 C.F.R. § 1630.2(h). It goes on to explain that the term substantially limits "is not meant to be a demanding standard," and "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(i)–(ii). "A person's ability to work is considered a major life activity." *Dooley v. Nevada Gold Mines, LLC*, 2023 WL 7279993, at *5 (D. Nev. Nov. 3, 2023) (citing 42 U.S.C. § 12102(2)).

Ulloa cannot show that he was disabled at the time of his termination. There was no information available on October 16 indicating that he suffered from a physical impairment substantially limiting a major life activity, such as his ability to work. In fact, the available medical records provided by his doctor at the time indicated that he "ha[d] suffered no permanent disability," (Dkt. 102-1 at 276), and Ulloa offers no evidence that he was regarded as having any disability at that time. "A doctor's release to work without restrictions supports a finding that a

person no longer suffers from a 'disability.'" *Garcia v. Salvation Army*, 918 F.3d 997, 1010 (9th Cir. 2019); *see also Stevenson v. Abbott Laboratories*, 639 F. App'x 473, 474 (9th Cir. 2016) ("[A]fter Plaintiff was released to work, she was not disabled."); *Rivera v. FedEx Corp.*, 2013 WL 6672401, at *4 (N.D. Cal. Dec. 18, 2013) (holding that plaintiff failed to demonstrate disability where released to work by a doctor without restriction).  The record in this case, which contains unrefuted medical records releasing him to full work with no permanent disability, fails to demonstrate that Ulloa was disabled at the time of his termination.  While Ulloa claims that Dr. Reyher "did nothing but misdiagnose and mistreat" him, he offers no evidence in the record to support this assertion.[10]  (Dkt. 103 at 13).

Instead, Ulloa relies on medical exams post-dating his termination, pursuant to which Dr. Rappaport,[11] a Reno spinal surgeon, diagnosed him with a herniated disk.  (Dkt. 103 at 7); (Dkt. 103-2 at 6–7).  On January 16, 2020, Dr. Rappaport "agreed with Dr. Reyher that the sprain of the lumbar spine had in fact resolved, but found a herniated disc at L5-S 1 was caused by the accident" and "separate degenerative changes shown on the MRI [which] were aggravated by the accident."

---

[10]     Plaintiff also argues that there existed a conspiracy between Barrick, the company's third-party worker's compensation administrator, and the two doctors he saw before his termination, in which those outside of Barrick were improperly and in bad faith "steered by Defendant," but these allegations are entirely speculative and unsupported by the record.  (*See* Dkt. 103 at 11–14).  Thus, these bad faith claims raise no genuine issue of material fact as to the reliability of the medical findings of Dr. Black and Dr. Reyher because "the arguments and statements of counsel 'are not evidence and do not create issues of material fact capable of defeating and otherwise valid motion for summary judgment.'"  *Barcamerica*, 289 F.3d at 593 n.4 (quoting *Smith*, 505 F.2d at 1249).

[11]     Nevada law states that "[i]f the injured employee is not satisfied with the first physician or chiropractor he or she so chooses, the injured employee may make an alternative choice of physician or chiropractor from the panel if the choice is made within 90 days after his or her injury."  NRS 616C.090(2). So, on August 29, 2019, Ulloa requested to transfer his care to his selected doctor, Dr. Arraiz, but this request was denied "pending the receipt of the [independent medical evaluation] report" Ulloa was "schedule[ed] [to undergo] with Dr. Rappaport" on January 16, 2020.  (Dkt. 103-12 at 4).

(Dkt. 103-2 at 7); (*see also* Dkt. 103-6 at 144) ("Given the onset of symptoms gradually evolving into sciatica, this would be consistent with an injury being sustained in the industrial incident of 06/04/2019 and gradually progressing.").   But Ulloa's reliance on Dr. Rappaport's medical examinations—which occurred months after his termination—is misplaced because "[t]he uncontroverted evidence presented to [Defendant] at the time of termination indicated that" Ulloa was not disabled.  *Kaplan v. City of North Las Vegas*, 323 F.3d 1226, 1230–31 (9th Cir. 2003); *Weyer*, 198 F.3d at 1112 (explaining that, under the ADA, "one must be discriminated against 'because of the disability'—which requires that the disability exist at the time of the discrimination"); *see also Fredenburg v. Conta Costa Cnty. Dep't of Health Servs.*, 172 F.3d 1176, 1178–79 (9th Cir. 1999) (holding that when there are "conflicting opinions about [a plaintiff's] ability to work" at the time of the employment decision, there exists "a genuine dispute" of material fact).

Because Ulloa "failed to submit any medical evidence prior to his termination" indicating that he suffered from a disability at that time, it was appropriate for Defendant to believe that Ulloa was, in fact, not disabled.  *Allen v. Pac. Bell*, 348 F.3d 1113, 1115 (9th Cir. 2003) (explaining that an employer "[does] not have a duty under the ADA" to further investigate whether an employee is disabled "in the absence of any such information").   Moreover, Ulloa conceded in a 2023 deposition that "[n]obody tells [him] nothing" because, even to this day, "[he] doesn't have anything wrong with [him], they tell [him]."  (Dkt. 102-1 at 295).   On this record, there is no

1  genuine dispute that, at the time of termination, Ulloa was not disabled within the meaning of the

2  ADA.[12]  For this reason, alone, his claim must fail.

3        **2.**      **At the time he was terminated, Ulloa was not a qualified individual under the ADA.**

4        Even if Ulloa were able to establish that he was disabled under the ADA at the time of his

5  termination, he would not have been a qualified individual able to perform the essential functions

6  of his job.  A "qualified individual" is "an individual with a disability who, with or without

7  reasonable accommodation, can perform the essential functions of the employment position that

8  such individual holds or desires."  42 U.S.C. § 12111(8).  A qualified individual also "satisfies the

9  requisite skill, experience, education and other job-related requirements of the employment

10  position such individual holds[.]"  29 C.F.R. § 1630.2(m).  Federal regulations define essential

11  functions as those "fundamental job duties of the employment position the individual with a

---

[12]  Ulloa argues that a Decision and Order issued on October 29, 2020—more than a year after his termination—by a Nevada Department of Administration Appeals Officer, which found that he "continued to have work restrictions that prevented him from returning to his pre-injury job … from September 18, 2019 through December 9, 2019," (Dkt. 103-4 at 4), "is entitled to administrative res judicata under Nevada law and is binding on Defendant." (Dkt. 103 at 15).  Defendant argues that this argument is "legally baseless" because "no subsequent finding of the Appeals Officer," which was notably based on an inapplicable standard, "can change the fact that Barrick was relying upon the most recent objective medical evidence at the time it terminated Ulloa." (Dkt. 110 at 9).  Barrick also points out that Ulloa failed to provide "the analysis required for this Court to apply issue preclusion on these facts[.]" (*Id.* at 9–10).

Ulloa relies on a citation to *Britton v. City of North Las Vegas*, 106 Nev. 690 (1990), alone, to support his argument, but his reliance is misplaced.  While *Britton* does stand for the proposition that "res judicata may apply to administrative proceedings," *id.* at 692, it does not necessarily follow that the Court in this case is estopped as a result of Appeals Officer's decision, especially since Ulloa has offered no analysis in support of his claim.  Moreover, *Britton* acknowledges "a number of cases which hold that administrative collateral estoppel should not be invoked in cases dealing with employment discrimination," *id.* at 692–93, and Ulloa has not explained why none of those cases are applicable here.  The findings of the Appeals Officer, using a standard different than the one pertinent here, are irrelevant to determining whether Ulloa was disabled under the ADA at the time of his termination because the findings rely on information that was not available at the time of his termination.  Therefore, the Court is not persuaded that res judicata applies here.

disability holds[.]"  29 C.F.R. § 1630.2(n)(1).  "The plaintiff bears the burden of proving that he is qualified."  *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 892 (9th Cir. 2001).

When determining whether an individual is qualified for purposes of the ADA, courts engage in a two-step inquiry.  *Bates*, 511 F.3d at 990.  "The court first examines whether the individual satisfies the 'requisite skill, experience, education and other job-related requirements' of the position. The court then considers whether the individual 'can perform the essential functions of such position' with or without a reasonable accommodation."  *Id.* (citations omitted). In this case, there is no dispute that Ulloa satisfies the first part of the inquiry.  The question is whether, assuming he was disabled, he could perform the essential functions of the job.  This issue presents a catch-22 for Ulloa who, by his own admission, he felt that he could not do his job.  (Dkt. 102-1 at 80, 121).  Ulloa testified that he believed he "wasn't going to be able to come back" to work "after the pain got worse," (*id.* at 121), and he did not even seek employment after his termination because he felt physically unable to work.  (*Id.* at 80).  But even if he had been physically capable of performing the essential job functions, the alleged safety violations he had committed not long before the incident were misconduct disqualifying him from ADA protection. *See Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 944 (9th Cir. 2015) ("Put simply, the ADA does not require that an employee whose unacceptable behavior threatens the safety of others be retained, even if the behavior stems from a mental disability. Such an employee is not qualified." (quoting *Calef v. Gillette Co.*, 322 F.3d 75, 87 (1st Cir. 2003))).  For these reasons, Ulloa is not a qualified individual under the ADA, and, again, his claim must fail.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### 3.      Ulloa cannot establish that he was terminated as a result of a disability.

Finally, even if Ulloa had been disabled and was a qualified individual, he is unable to establish causation—that his disability was the but-for cause of his termination.  *Murray v. Mayo Clinic*, 934 F.3d 1101, 1107 (9th Cir. 2019) (holding that "ADA discrimination claims … must be evaluated under a but-for causation standard").  The ADA does not require that discrimination be the employer's only motive and, instead, "outlaws adverse employment decisions motivated, *even in part*, by animus based on a plaintiff's disability or request for an accommodation[.]"  *Dark v. Curry Cnty.*, 451 F.3d 1078, 1085 (9th Cir. 2006) (emphasis in original) (citation omitted).  Still, to satisfy the but-for causation standard, Ulloa must prove that his termination "would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  On this record, it is undisputed that Ulloa is unable to do so.

Ulloa's alleged disability could not have been the but-for cause of his termination because, as the Court has already discussed, there was no medical evidence indicating he had a disability at the time he was terminated.  (Dkt. 102-1 at 276); *see McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 ("The employer could not have been motivated by knowledge it did not have[.]").  In reliance on the uncontroverted medical information available at the time, there was no way that Defendant could reasonably know of any disability when he was terminated on October 16.  Therefore, Barrick's basis for terminating Ulloa could not have been even in part improperly motivated by a disability.  *See Kaplan*, 323 F.3d at 1230 (finding that the defendant was reasonable for relying on "[t]he uncontroverted medical evidence presented to [it] at the time of termination" in making employment decisions); *see also Allen*, 348 F.3d at 1115 (holding that

employment decision was "appropriate" in light of employee's failure "to submit additional medical evidence" to the contrary).

Moreover, even if Barrick had somehow known of a disability for which there was no evidence, given Ulloa's pattern of misconduct and policy violations, (Dkt. 102-1 at 286), it would be difficult to show that Defendant's offered legitimate, non-discriminatory reason for termination was simply pretextual. (*See* Dkt. 97 at 23–25). In fact, Ulloa can point to nothing other than his own personal belief to support the claim that Barrick's offered reason was merely a pretext. (Dkt. 103 at 26, 27, 20–21, 22). On this record, it is impossible to make a prima facie case that Ulloa's termination was improperly motivated in violation of the ADA. *Mantolete v. Bolger*, 767 F.2d 1416, 1424 (9th Cir. 1985) ("The asserted basis for the employer's [employment] decision … is limited to the evidence relied on by the employer at the time the decision was made."). But even if it were possible, Barrick has offered a legitimate and non-discriminatory reason for Ulloa's termination, which Ulloa has failed to rebut as merely pretextual. For these reasons also, Ulloa's claim must fail.

## C.    Defendant is entitled to summary judgment on Plaintiff's failure to accommodate claims.[13]

In a test almost identical to that for disability discrimination claims, a prima facie case for failure to accommodate requires a plaintiff to demonstrate that (1) he is disabled within the meaning of the ADA, (2) he is a qualified individual able to perform the essential functions of the

---

[13] In a previous ruling, this Court held that "Plaintiff's claim that he did not receive reasonable accommodations shall only go forward regarding 'the failure to accommodate [Ulloa] … after October 2, 2019.'" (Dkt. 92 at 10) (quoting Dkt. 53 at 14). Having narrowed the scope on Ulloa's failure to accommodate claim, the relevant inquiry now is whether Barrick failed to accommodate Ulloa between receiving his release on October 2 to when he was terminated on October 16.

21 of 24

job with reasonable accommodation, and (3) he suffered an adverse employment action because of his disability. *Samper v. Providence St. Vincent Medical Center*, 675 F.3d 1233, 1237 (9th Cir. 2012) (quoting *Allen*, 348 F.3d at 1114). To survive summary judgment, the plaintiff must also show that there was a facially reasonable accommodation available. *Dark*, 451 F.3d at 1088 (explaining that the plaintiff bears "the burden of showing the existence of a reasonable accommodation that would have enabled him to perform the essential functions of" his job). "[O]nce an employee requests an accommodation … the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation." *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002).

Because the Court has already determined that Ulloa was neither disabled nor a qualified individual under the ADA during the relevant time, Ulloa's failure to accommodate claim necessarily fails. But, even if that were not the case, Ulloa cannot establish the third element of his causation claim because he was not denied an accommodation—he did not suffer the alleged adverse employment action. Defendant provided Ulloa with adequate accommodation—paid leave. (Dkt. 102-1 at 124–25). This Court has already ruled that Defendant "provided Plaintiff with a reasonable accommodation during the four-month period" between his injury and his release "because Plaintiff received paid leave." (Dkt. 92 at 10); *see also Reza v. Int'l Game Tech.*, 351 F. App'x 188, 190 (9th Cir. 2009) (holding that "an extension of [Plaintiff's] medical leave" is a "reasonable accommodation"); *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1135 (9th Cir. 2001) ("A leave of absence for medical treatment may be a reasonable accommodation under the ADA").

Although an employee without a disability who has been suspended pending an investigation is not owed any accommodation under the ADA, Defendant still voluntarily kept Ulloa on paid leave after he was medically released to work.  (Dkt. 102-1 at 273).  Accordingly, he cannot maintain that Defendant ever failed to provide him with reasonable accommodations (even if the accommodation was not the one he would have preferred),[14] because he was provided a reasonable accommodation—and he was not even entitled to one.  *Zivkovic*, 302 F.3d at 1089 ("An 'employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation.'" (citation omitted)).

**D.    The Court declines to reach Ulloa's state-law claim for tortious discharge.**

The last remaining Claim in this case is for "retaliatory discharge in violation of public policy under Nevada law," (Dkt. 48 at 14–15), which arises under state common law.  *See Hansen v. Harrah's*, 100 Nev. 60 (1984).  Having dismissed all of Plaintiff's claims arising under federal law, the Court declines to extend supplemental jurisdiction over the remaining claim.

---

[14]    Ulloa asserts that "Defendant had a duty to engage in a good faith interactive process to try to accommodate Juan under the ADA, and that "[i]t is undisputed that Defendant did not follow the law and did not engage in the required interactive process."  (Dkt. 103 at 17).  Barrick argues that this is not true because "[f]rom June 6, 2019 until the day he was terminated, Ulloa was accommodated with paid leave," which "it could not have done [] without engaging in the interactive process."  (Dkt. 110 at 16).  Having found that Barrick engaged in the interactive process and provided paid leave as an accommodation up to October 2, 2019, (Dkt. 92 at 10), the Court is not persuaded that that engagement ended when Ulloa was provided paid leave after October 2, 2019.  Moreover, Ulloa's conclusory allegations that, due to his pain complaints and October 2 letter, "Defendant was clearly on notice that Juan was NOT full duty as to all conditions," are not evidence that Barrick "did not follow the law[.]"  (Dkt. 103 at 17).  Unless the Court is to believe Ulloa's aforementioned baseless conspiracy theory, there is no reason to believe that Barrick neglected its legal duty to engage in the interactive process in good faith.

**CONCLUSION**

IT IS HEREBY ORDERED that Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment and All Exhibits Thereto, (Dkt. 101), is **DENIED AS MOOT**.  Defendant is **ORDERED** to pay a penalty of $100 to Plaintiff for violation of Local Rule 54-1(a).

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment, (Dkt. 97), is **GRANTED IN PART** as to Claims 1, 2, 4, and 5 of Plaintiff's Second Amended Complaint, (Dkt. 48 at 11–14, 15–18).  Claims 1, 2, 4, and 5 are **DISMISSED WITH PREJUDICE**.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment, (Dkt. 97), is **DENIED IN PART** as to Claim 3 of Plaintiff's Second Amended Complaint, (Dkt. 48 at 14–15).  Claim 3 is **DISMISSED WITHOUT PREJUDICE**.

IT IS FURTHER ORDERED that the Clerk of the Court shall close the case.

IT IS SO ORDERED.

Dated February 22, 2024.

_____
ROBERT C. JONES
United States District Judge